UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------  X
:
BRITISH MARINE PLC,                                          :
:
                    Plaintiff,   :   **MEMORANDUM**
:   **DECISION AND ORDER**
       -against-                           :
:   13 Civ. 0839 (BMC)
:
AAVANTI SHIPPING & CHARTERING LTD.,      :
ANIK INDUSTRIES, LTD. f/k/a MADHYA        :
PRADESH GLYCHEM INDUSTIRIES, LTD.,        :
and RUCHI SOYA INDUSTRIES LTD.,            :
:
:
               Defendants.

-----------------------------------------------------------  X
**COGAN**, District Judge.

       Defendants Ruchi Stoya Industries, Ltd. ("Ruchi") and Anik Industries, Ltd. ("Anik"), move under Federal Rule of Civil Procedure Rule 12(b)(6) and Rule E(4)(f) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure (the "Supplemental Rules") to dismiss the Second Amended Complaint and to vacate the Ex Parte Order and Process of Maritime Attachment and Garnishment dated February 20, 2013 (the "Attachment Order"). For the reasons that follow, the motion is denied.

## BACKGROUND

       Plaintiff British Marine PLC is a ship owner based in England. Defendant Aavanti Shipping and Chartering, Ltd. ("Aavanti"), is a shipping company registered in Hong Kong. Defendant Anik, known as Madhya Pradesh Gylchem Industries, Ltd. until 2006, is a publicly-traded Indian company whose business includes trading in commodities like coal. Defendant Ruchi is another publicly traded Indian company, in the business of manufacturing, buying and selling edible oils and other agricultural commodities. Plaintiff alleges, and defendants do not

deny, that both Anik and Ruchi are part of the "Ruchi Group," a large Indian food and steel conglomerate.

In 2009, plaintiff entered into a maritime Contract of Affreightment ("COA") with Aavanti. The COA provided that Aavanti was to provide and pay freight for a certain number of coal cargoes per year over the duration of the five year contract. Plaintiff had entered a similar contract in 2007 with Anik as the charterer; plaintiff alleges that Aavanti essentially replaced Anik as the charterer on the 2009 COA. The 2009 COA was negotiated through a broker, Saigal Seatrade ("Saigal"). The COA stated that Aavanti's performance would be guaranteed first by Anik, and "in case Anik Industries default [sic] then Ruchi Soya Industries Ltd. to be ultimately responsible for the performance of this charter." The copy of the 2009 COA attached to the complaint is unsigned; however, plaintiff has also submitted contemporaneous email correspondence concerning the 2009 COA, including a fixture recap containing the guarantee, sent by Saigal to personnel at Ruchi and Anik.

On February 14, 2013, plaintiff filed its complaint in this action, alleging that Aavanti had breached its obligations under the COA, and that Ruchi and Anik were liable either as guarantors of the COA or as alter egos of Aavanti.[1] Plaintiff sought and received permission to serve the Attachment Order and attach property belonging to the defendants within this District. The Attachment Order included "debts" among the listed types of property that could be attached, and specifically listed Wego Chemical & Mineral Corp. ("Wego") as a potential third-party garnishee. On February 21, plaintiff served the Order of Attachment on Wego by hand.

Wego regularly purchased chemicals from Ruchi. On January 25, 2013, Wego transmitted two purchase orders to Ruchi for hydroxyl stearic acid for a total cost of $116,870.

---

[1] The parties have represented that, pursuant to an arbitration clause in the COA, the merits of this dispute will be resolved through arbitration in London. This action is therefore an effort by plaintiff to gain security for any judgment awarded in that arbitration.

2

On January 29, Wego transmitted a purchase order to Ruchi for more hydroxyl stearic acid for a total cost of $29,217.50. The purchase orders relating to these transactions stated "Cash Against Copy" under "Payment Terms," and that both title to the goods and risk of loss would pass to Wego upon tender in the port of origin, in India. Further, the invoices submitted by Ruchi stated "100% Wire Against Fax B/L" under the heading "Terms of Delivery and Payment."[2] On February 19, Wego received copies of the bills of lading for these orders, which indicated that the chemicals had shipped from India some days earlier. On March 25 and April 1, despite having been served with this Court's Order of Attachment, Wego paid Ruchi $29,217.50 and $116,870.00. At a subsequent contempt hearing, the Court rejected Wego's argument that, under the parties' course of dealing, Wego owed Ruchi no debt when it was served with the Attachment Order on February 21. The Court required Wego to pay $146,087.50 into the Court's registry, representing the amount it paid to Ruchi in connection with the two purchase orders.

## DISCUSSION

On a motion to dismiss under Rule 12(b)(6), the Court must assume the truth of "all well pleaded, nonconclusory factual allegations" in the complaint. Harrington v. Cnty. of Suffolk, 607 F.3d 31, 33 (2d Cir. 2010) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). The Court must also draw "all reasonable inferences in the plaintiff's favor." Famous Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106, 108 (2d Cir. 2010). Nevertheless, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

In the context of a maritime attachment under Rule B, plaintiffs must also satisfy Rule E(2)(a)'s heightened pleading standard, which requires that the complaint "state the

---

[2] B/L refers to "Bill of Lading."

circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." FED. R. CIV. P. SUPP. R. E(2)(a). This heightened pleading requirement is intended to ensure that a party "does not seize and hold, for a substantial period of time, property to which, in reality, it has no legitimate claim." United States v. Premises & Real Prop., 889 F.2d 1258, 1266 (2d Cir. 1989). Additionally, in determining the sufficiency of a complaint under Rule E(2)(a), a court may "examine[ ] supporting affidavits to determine whether they cure a lack of particularity in the complaint itself." Id.

In order to defeat a motion to vacate a maritime attachment under Rule B, the burden rests on the plaintiff to show that (1) the plaintiff has a valid prima facie admiralty claim against the defendant; (2) the defendant cannot be found within the district; (3) the defendant's property may be found within the district; and (4) there is no statutory or maritime bar to the attachment. See Aqua Stoli Shipping Ltd., v. Gardner Smith Pty. Ltd., 460 F.3d 434 (2d Cir. 2006) (abrogated on other grounds by Shipping Corp. of India v. Jaldhi Overseas Pte Ltd., 585 F.3d 58 (2d Cir. 2009)). Here, defendants challenge plaintiff's allegations as to the first and third elements.

I.   **Presence of Defendants' Property**

Defendants contend that plaintiff did not successfully attach any property of Ruchi's when it served the Attachment Order on Wego. The Attachment Order listed "debts" as a type of property that could be attached. Defendants correctly point out that an attachment (maritime or otherwise) is effective only if the garnishee owes the defendant a debt at the time of service. See Reibor Intern. Ltd. v. Cargo Carriers (KACZ-CO.) Ltd., 759 F. 2d 262 (2d Cir. 1985). Further, although an unmatured debt – i.e., a debt that is not yet due to be paid – may be subject to Rule B

4

attachment, "the unmatured debt [must arise] from an executed contract." Clipper Shipping Co., Ltd. v. Unimarine Bulk Transport, Inc., 790 F. Supp. 56 (D. Conn. 1992) (quoting Reibor, 759 F.2d at 265). Defendants argue that, according to their terms, the contracts were not fully executed until Ruchi provided the original bills of lading to Wego; Wego therefore did not owe Ruchi any debts at the time of service.

The plain terms of the invoices and purchase orders between Wego and Ruchi, and the timeline of their dealings, demonstrate otherwise. On January 25 and 29, 2013, Wego submitted orders to Ruchi in the amount of $116,870 and $29,217.50. The purchase orders stated that "payment method" was "Cash against copy" and that "title to the goods shall remain with the Seller until: tender at Port of Origin." The invoice from Ruchi stated "100% Wire Against Fax B/L" under the heading "Terms of Delivery and Payment." On February 19, Wego received copies of the shipping documents for these orders, which stated that the goods had been shipped on February 15. On February 21, British Marine personally served the Attachment Order on Wego.

Relying on Unimarine, defendants argue that, despite the language of the purchase orders and invoices, Wego did not have any obligation to pay Ruchi until the original bills of lading were delivered to Wego. Unimarine actually demonstrates exactly why defendants are incorrect. There, the court placed great weight on the fact that the parties "had specifically negotiated for [a] provision making surrender of the [original] bill of lading a precondition of payment." See Unimarine, 790 F. Supp. at 61. Here, although the contracts do require Ruchi to send the original bills of lading to Wego's New York office via courier, there is no provision linking that requirement to Wego's obligation to pay. Indeed, the only terms explicitly relating to payment refer to "Copies" or "Fax B/L." If Ruchi and Wego, both sophisticated parties, had intended to

5

make payment contingent on delivery of original bills of lading, they could have easily included language to that effect. Because Ruchi provided copies of the bills of lading on February 19, Wego owed debts to Ruchi when plaintiff served the Order of Attachment on February 21. Plaintiff therefore successfully attached property belonging to Ruchi in this District. Further, because the Court concludes below that plaintiff has adequately alleged that the other defendants are alter egos of Ruchi, the presence of Ruchi's property within the District suffices to establish quasi in rem jurisdiction over them as well. See Transfield ER Cape Ltd. v. Industrial Carriers, Inc., 571 F.3d 221 (2d Cir. 2009) (noting that "alter egos are treated as one entity for jurisdictional purposes").

## II. Prima Facie Admiralty Claim

The Rule B inquiry is partly procedural and partly substantive: whether a claim sounds in admiralty is a procedural question governed by federal law, and whether that claim is prima facie valid is a substantive question governed by the relevant body of substantive law. See Blue Whale Corp. v. Grand China Shipping Dev. Co., Ltd., 722 F.3d 488 (2d Cir. 2013). Plaintiff brings two claims for relief. First, plaintiff alleges that defendants are liable as guarantors of Aavanti's performance under the COA. Second, plaintiff alleges that defendants are liable as alter egos of Aavanti. The parties do not dispute that plaintiff's allegations sound in admiralty law; rather, defendants attack the validity of these claims.

### A. Breach of Contract

First, the parties dispute the existence of a contract requiring Ruchi and Anik to guarantee Aavanti's performance under the COA. As mentioned, the COA itself explicitly stated that the first performance was to be guaranteed by Anik Industries, and that "in case Anik Industries default [sic] then Ruchi Soya Industries Ltd. to be ultimately responsible for the performance of

6

this charter." Plaintiffs also annex to their complaint a fixture recap memorializing these terms, sent via email by the broker, Saigal, to two individuals associated with Ruchi and Anik, Manish Shahra and Captain Ajay Kant Jha. Defendants argue that the guarantee agreement does not satisfy the statute of frauds under English law.[3]

Defendants contend that plaintiffs have not adequately alleged the existence of a valid guarantee contract, arguing that the guarantee was not sufficiently evidenced by in writing, nor signed by the guarantor or on its behalf by someone with the authority to do so. A recent English case held, similarly to the rule in New York,[4] that a contract of guarantee may be enforceable even when it is not evidenced in a single document signed by the guarantor, but rather in a series of documents containing the terms. See Golden Ocean Grp. Ltd. v. Salgaocar Mining PVT Ltd. et al., [2012] EWCA (Civ) 265. The explicit language from the 2009 COA makes defendants' repeated assertion that plaintiffs offer "no evidence" at all that a guarantee even existed somewhat puzzling. It is difficult to envision stronger evidence that a performance guarantee exists than language in the underlying contract which explicitly states that a performance guarantee exists. Clearly, a guarantee existed in the 2009 COA; the question is whether Ruchi and Anik actually agreed to it. Therefore, defendants' argument must be that despite the explicit language of the COA and fixture recap, the guarantee is invalid because neither document was actually signed by Ruchi, Anik, or someone with the authority to bind them.

---

[3] It is not entirely clear whether plaintiff contests the applicability of English substantive law to its breach of contract claim. Plaintiff addresses all of its briefing on choice of law to its alter ego claim, but also cites authorities for the proposition that oral guarantee contracts are enforceable under maritime law. See, e.g., Mercator Line, Inc. v. Witte Chase Corp., No. 88 CIV. 8060, 1990 WL 52254 (S.D.N.Y. Apr. 18, 1990). Because it does not change the result, the Court presumes for the purposes of this motion that English law applies to plaintiff's breach of contract claim.

[4] See, e.g., Louros v. Cyr, 175 F. Supp. 2d 497, 511 (S.D.N.Y. 2001) (noting that under New York law, the statute of frauds may be satisfied by "several documents only some of which are signed, provided that they clearly refer to the same transaction").

7

It bears noting what defendants do not argue. They do not argue that Anik and Ruchi were unaware that the 2009 COA contained this performance guarantee. They do not argue that they did not receive the fixture recap from Saigal that contained those terms. Nor do they argue that Saigal did not have authority to bind Anik and Ruchi to such a guarantee. Indeed, defendants provide no plausible explanation whatsoever for why the performance guarantee would appear in the COA if Ruchi and Anik had not agreed to it. Although plaintiff bears the burden of persuasion at this stage, defendants' failure to provide any alternative explanation weighs against dismissing the complaint under the statute of frauds.

In light of the ample evidence that a guarantee existed, and that Ruchi and Anik were aware that the 2009 COA contained such terms, the absence of a signed document attached to the complaint is an insufficient basis for dismissal. The Golden Ocean court also held that signatures may be electronic, and the definition of "signature" may include a first name, initials, or other informal means of identifying the authenticator. Although plaintiffs have not yet produced a writing that satisfies the signature element,[5] it seems entirely plausible that discovery will produce documents from the negotiations which satisfy this element for Ruchi and Anik. Alternatively, discovery could reveal documents sufficiently "signed" by Saigal, and sufficient evidence that Saigal had authority to bind defendants. Plaintiff has adequately alleged a prima facie case for breach of a maritime contract.[6]

---

[5] The emails attached to the Complaint that describe the guarantee appear to have been sent to Ruchi and Anik and to Saigal, and thus cannot be used to demonstrate defendants' assent or Saigal's assent on defendants' behalf.

[6] Indeed, although the parties have not briefed this point, analogy to the Federal Rules of Civil Procedure underscores that the motion to dismiss should be denied. The statute of frauds is an affirmative defense under the Federal Rules. See, e.g., Zeising v. Kelly, 152 F. Supp. 2d 335 (S.D.N.Y. 2001). Consideration of an affirmative defense on a Rule 12(b)(6) motion is appropriate where, as here, the defense appears on the face of the complaint. See Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147 (2d Cir. 2003). However, dismissal should not be granted unless the affirmative defense creates "an insuperable barrier to recovery by the plaintiff." Flight Sys., Inc. v. Electronic Data Sys. Corp., 112 F.3d 124 (3d Cir. 1997). This case

B. Alter Ego

The parties contest whether plaintiff's alter ego claims should be analyzed under English or federal common law. The Second Circuit's recent decision in Blue Whale controls this inquiry, and requires a court to "ascertain[ ] and valu[e] points of contact between the transaction and the states or governments whose competing laws are involved." Blue Whale, 722 F.3d at 498. Here, under facts similar to those presented in Blue Whale, the analysis indicates that federal common law should apply.

First, as in Blue Whale, the relevant transaction to plaintiff's alter ego cause of action is plaintiff's attempt to pierce the corporate veil, and not the underlying COA itself. Second, plaintiff initiated this proceeding here in the Eastern District of New York, and has successfully attached defendants' property here. Further, this case involves several sources of foreign law. Plaintiff is an English company. Ruchi and Anik are Indian companies. Aavanti, meanwhile, has its registry in Hong Kong, although plaintiff alleges Aavanti's place of business is actually in Singapore. Thus, as in Blue Whale, there is an "absence of a dominant foreign choice of law." Id. at 500. In all, given the presence of defendants' property in this district, plaintiff's choice of forum, and the absence of a strong connection between this action and any single foreign jurisdiction, federal common law has the strongest "points of contact" to plaintiff's alter ego claim. See id. at 499.

As to the adequacy of plaintiff's alter ego allegations, it is important to note that the "Court must not decide, at this point, whether [a plaintiff] has advanced sufficient evidence to support [its alter ego claim], or whether [a defendant] has rebutted such evidence through its own submissions." Hawknet Ltd. v. Overseas Shipping Agencies, No. 07 Civ. 5912, 2008 WL

---

is not one where the pleadings themselves happen to make clear that the statute of frauds cannot be satisfied, for example by alleging a purely oral contract in circumstances in which a writing is required.

1944817 at *3 (S.D.N.Y. Apr. 29, 2008). Instead, the inquiry is limited to whether plaintiff has plausibly alleged an alter ego claim, with enough particularity to allow defendants to frame a responsive pleading.

Federal common law allows piercing of the corporate veil where "(1) a corporation uses its alter ego status to perpetrate a fraud or (2) where it so dominates and disregards its alter ego's corporate form that the alter ego was actually carrying on the controlling corporation's business instead of its own." Id. Courts consider a number of factors in making this determination. These include: "(1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms' length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities." MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC, 268 F.3d 58, 63 (2d Cir. 2001). "There is no set rule as to how many of these factors must be present to warrant piercing the corporate veil and courts have considered additional factors as well. Instead of a firm rule, the general principle guiding courts in determining whether to pierce the corporate veil has been that liability is imposed when doing so would achieve an equitable result." Williamson v. Recovery Ltd. P'ship, 542 F.3d 43, 53 (2d Cir. 2008).

Plaintiff has, without the benefit of discovery, come forward with quite detailed factual allegations addressing many of these factors. These allegations, which the Court must presume to be true, plausibly suggest that the three entities were treated as one by defendants. First, Aavanti, registered in Hong Kong, is undercapitalized, with about $1300 in authorized share

10

capital.  Further, plaintiff alleges that Aavanti does not actually have an office in Hong Kong.  Instead, plaintiffs identify an address in Singapore, which defendant Aavanti allegedly shares with a company called "Aavanti Industries Pte Ltd," and another company called "Ruchi Food Solutions Singapore."  More tellingly, plaintiff's President of Chartering, Parikshit Sial, alleges that no individuals independently associated with Aavanti were involved in the negotiations leading up to the 2009 COA.  Rather, Captain Jha represented all three entities.  Updates on shipments under the COA were sent by port agents to Ruchi and Anik personnel, often without copying anyone from Aavanti.  Plaintiff also alleges that Ruchi and Anik regularly guaranteed Aavanti's contracts, and that Aavanti is a wholly owned subsidiary of Anik.

    Although any one of these allegations by itself might be insufficient, taken together, plaintiff has adequately alleged a prima facie alter ego claim with sufficient particularity.  Courts in this Circuit have held that allegations similar in substance were adequate.  See, e.g., Budisukma Permai SDN BHD v. N.M.K. Prods. & Agencies Lanka, 606 F. Supp. 2d 391 (S.D.N.Y. 2009) (collecting cases).  To the extent that defendants challenge the sufficiency of plaintiff's evidence, rather than the adequacy of plaintiff's allegations, their arguments are premature.  It may well be that, after discovery, plaintiff ultimately is unable to prove the merits of its allegations that Ruchi, Anik and Aavanti are alter egos of one another.  But plaintiff's allegations are sufficient at this stage in the litigation.

## CONCLUSION

Defendants' motion [46] to vacate the Attachment Order and dismiss the Second Amended Complaint is denied.

**SO ORDERED.**

Digitally signed by Brian M. Cogan
_____
U.S.D.J.

Dated: Brooklyn, New York
November 18, 2013